IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VULCAN MATERIALS COMPANY, a New
Jersey Corporation,

               Plaintiff,

               vs.                             Case No. 02-1251-JTM

ATOFINA CHEMICALS
INCORPORATED, a Pennsylvania
Corporation, and ATOFINA S.A., a French
Corporation,

               Defendants.

MEMORANDUM AND ORDER

This matter is before the court on ten motions submitted by the parties: three motions for partial summary judgment, five motions in limine, and two miscellaneous motions seeking to expand (a motion for leave to file a surreply) or contract (a motion to strike) the pleadings or evidence otherwise before the court. For the reasons stated herein, the court will partially grant and partially deny the relief sought by both parties.

Because much of the material supporting the various motions, as well as the motion for surreply itself, has been filed under seal, the court has previously directed the Clerk of the Court to file a copy of the present order under seal as well. However, the court noted that the protective orders currently in place in the present action were largely the result of agreement of the parties, (Dkt. No. 136), or based upon a generic assertion of confidentiality and expediency and convenience

(Dkt. No. 360, granting Dkt. No. 359, which noted a blanket seal of briefs was the "most efficient, least time-consuming, and less confusing" means for briefing as opposed to "sort[ing] through the documents to determine which ones should be filed electronically and which should be filed manually, under seal."). Accordingly, the court directed the parties to specify which portions, if any, of the present order they contend should remain under seal, along with the specific justification which the party or parties contends overrides the general public interest, on or before January 6, 2005.[1] *See Ratts v. Board of County Com'rs of Harvey County*, 141 F.Supp. 1289 (D. Kan. 2001) (giving parties two weeks to show cause why summary judgment memorandum and order should not be unsealed).

As the court noted, there is a fundamental distinction between the broad latitude the court has to accord confidentiality to the parties' discovery and other preliminary proceedings, and the narrower discretion the court has in issuing orders resolving litigation. Disclosure of the basis for a court's orders is the rule, not the exception. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). *See also Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (noting that "if the case had gone to trial and the documents were thereby submitted to the court as evidence, such documents would have been revealed to the public" and not subject to protective order). The court must bear in mind the strong public policies supporting open access to the decisions of the courts, and that "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons." *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982). Indeed, as a general rule, documents submitted as a part of motions for

---

[1]The court also directed that such motions showing cause might be filed under seal.

summary judgment are subject to public right of access.  *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986).

The parties have responded to the court's directive.  Vulcan has stated that it has no objection to unsealing the order in its entirety.  The Atofina defendants have submitted a pleading designating portions of the proposed order for redaction, emphasizing in particular Atofina's replacement supply contracts with third parties.  Atofina's pleading in support of redaction states that the alternative supply contracts are confidential, and that "public disclosure of these arrangements and their terms would harm defendants in their current and prospective negotiations concerning business transactions with thrid parties involving cholorform and R-22."  (Def. Resp. at 1-2).

The court will not grant the proposed redactions, and shall direct the Clerk of the Court to file as unsealed the present order, which incorporates in full the earlier sealed order.  The burden is on the parties to show why the order of the court should be sealed in any particular respect.  However, no evidence of actual or likely harm has been presented by defendants; their assertion of potential future harm is simply the uncorroborated argument of counsel.  This is insufficient to counterbalance the strong interest in open public access to rulings of the court.  Were the matter to have proceeded to trial without summary judgment, evidence of the alternative supply contracts would have been submitted in open court.  The court has also examined the individual redactions proposed by defendants, and finds that they seek to exclude virtually any detail as to the alternative supply contracts, including the dates they were entered into.  The court finds no basis, on the record before it, for concluding that the important public interest in open rulings by the court has been overridden, and that justice requires sealing any element of this order.

3

**I. Summary Judgment.**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).

The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Given the extensive, indeed frequently repetitive, nature of the evidence and argument submitted to the court with respect to the summary judgment and other motions, motions for reconsideration of the present memorandum and order are discouraged.  Such motions under Fed.R.Civ.Pr. 59(e) may be granted only to correct manifest errors or present newly discovered (but previously undiscoverable) evidence.  *Anderson v. United Auto Workers*, 738 F.Supp. 441, 442 (D. Kan. 1989).  Any such request or motion shall not exceed five, double-spaced pages, shall not reiterate evidence or repeat arguments previously made to the court in the pleadings already on file, and shall be filed on or before December 30, 2004.  Any response to such a motion is subject to the same limitations, and shall not be filed on or after January 14, 2005.  No reply is permitted.

The court finds that the following facts are established as uncontroverted.  To the extent that the requested findings of fact are not included herein, it is because the requested findings are irrelevent, not supported in the evidence, or are not presented in the manner set forth under D.Kan.R. 56.1.

## A. Findings of Fact

Plaintiff Vulcan Materials Company is based in Birmingham, Alabama.  It operates chemical plants in Wichita, Kansas and Geismar, Louisiana.  Vulcan produces chlorine, caustic soda, hydrochloric acid, chloroform, and other chemicals at its Wichita plant.

Defendant ATOFINA Chemicals ("Atofina"), formerly known as Elf Atochem North America, Inc., is based in Philadelphia, Pennsylvania.  Until June 2002, Atofina operated a chemical

plant in Wichita, Kansas.  Defendant ATOFINA S.A. ("Atofina France") is a French corporation based in Paris, France.

The evidence is unclear as to the precise relationship between Atofina and Atofina France.

Defendants contend that the two corporations are merely affiliates, both owned by Total S.A. Atofina and Atofina France are both parts of Total's Chemical Branch.  However, cited authority (Atofina branch manager Bruno Estagnasie), asked if the defendant corporations, along with a third Elf Aquitaine, are "separate and distinct corporate entities," responded ,"I don't know."  He testified that Atofina and Atofina France are "sister companies," but also testified that "It's complicated.  I don't feel at ease to answer this question."  There is evidence in the form of an affidavit from Hélène Monceaux that the defendants are in fact sister companies under the general ownership of Total.

Atofina's Wichita plant was the only place Atofina made R- 22.  Atofina France owns an R-22 plant in France, and, through other affiliates, R-22 plants in Spain and China.  Atofina France manufactures chloroform in France.

Before June of 2002, Atofina bought from Vulcan the chloroform it needed to make R-22. Atofina's Wichita plant was physically adjacent to Vulcan's Wichita plant, and was connected to Vulcan's plant by a system of pipelines.

R-22 is a chemical generally used in North America as a refrigerant.  It is also known as HCFC-22, F-22, Forane 22, and chlorodifluoromethane.  One component of R-22 is chloroform (also known as CFM and CHCl3).  R-22 is produced by chemically reacting chloroform and hydrofluroic acid.

Atofina had historically lost money producing R-22.  It lost approximately two million dollars each year between 1990 and 1997.  It gained a profit in 1998 and 1999, but lost money again

in 2000, and forecast additional losses in 2001.  Atofina's total income from the Wichita plant in 1999 was approximately $4.7 million.  Vulcan knew Atofina had accepted the risk of plant closure because it knew if Atofina decided to close its plant, Vulcan would have 12-months' notice.  Atofina wanted a twelve-month notice provision in the 1999 Agreement to, if necessary, allow it to find an alternate source of chloroform supply.  Atofina understood that if R-22 production stopped in Wichita, Vulcan would have to find new customers for the chemical products it manufactured in Wichita.

Occasionally, prior to the 1999 agreement which is at the heart of the present case, Atofina raised the possibility of closing its plant.  Vulcan was told in 1998 that Atofina will "probably need to rationalize R-22 production somewhere in 3-5 years."  One employee of Vulcan testified that the company "had heard [from Atofina] the possibility of we're going to shut it down if you don't lower your price many, many, many times."  Notwithstanding these statements of potential closure, Vulcan and Atofina entered into a series of contracts for the sale of chloroform from Vulcan to Atofina. Prior to June 1, 1999, Atofina bought the chloroform needed for its R-22 manufacturing from Vulcan, pursuant to a June 1, 1994 Chloroform and Muriatic Acid Sales Agreement.  The 1994 Agreement had an initial five-year term, from June 1, 1994 to May 31, 1999.

On September 1, 1999, the parties entered into a new Sales Agreement.  Atofina's negotiators for the 1999 Sales Agreement included Dave Thomas (Atofina's Manager of Chemical Purchases) and Thomas Parrillo (Vice-President of Supply Chain).  The initial term of the 1999 Agreement was for three years:  from September 1, 1999 through August 31, 2002.

Section 2.2 of the 1999 Agreement provides:

The initial term of this Agreement shall extend for three (3) years after it becomes effective ("Initial Term"). Thereafter, this Agreement shall renew automatically for successive twelve (12) calendar month periods ("Additional Term(s)") unless the Agreement is terminated pursuant to the provisions of this Agreement. In addition to the specific rights of termination provided herein, either party may terminate this Agreement after the Initial Term effective upon the expiration of twelve (12) months prior written notice mailed to the other party. The Initial Term and any Additional Terms shall sometimes be collectively referred to herein as the "Term."

(1999 Agreement at 4).

Under Section 3.1 of the 1999 Agreement, Atofina was obligated to purchase its "entire requirements of chloroform" for the Wichita plant from Vulcan. (Id.) The same section provided that Vulcan was not required to deliver more than 5,000 tons of chloroform to Atofina "in any calendar month during the Term." The 1999 Agreement required Atofina to provide Vulcan with estimates of its chloroform needs. It required Atofina to give an estimate of its monthly chloroform requirements for the next calendar year on or before November 1 of each year, and to provide updated forecasts by the eighth working day of the month preceding each upcoming month and quarter.

The 1999 Agreement set a base price of $480 per ton ($0.24 per pound) for chloroform. Vulcan could change the price for its chloroform, upon 30-days written notice, subject to certain limitations. After notification of a chloroform price change by Vulcan, Atofina was to calculate its average bulk equivalent R-22 price for the three-month period preceding Vulcan's notice. (§ 4.1.1). If the price was less than $0.95/lb, Vulcan's chloroform price could not exceed the lowest price Vulcan charged to any other domestic chloroform customer,[2] excluding those customers who purchased chloroform solely for polymer production, on a net of freight and price rebate basis at

_____

[2]Vulcan's only domestic non-polymer chloroform customer, other than Atofina, was Honeywell.

Vulcan's producing plant.  (§ 4.1.2).  The Agreement suspended the price limitations if Atofina's imports of R-22 in any three month period exceeded its three-month average of imports in 1998 and if Atofina's pipeline chloroform purchases from Vulcan were less than 8,500 tons for the same period.  (§ 4.1.4).

The Agreement provided that it would be "enforced and otherwise governed in all respects by the laws of the State of Kansas" (1999 Agreement at 13, § 15.)

The 1999 Sales Agreement did not specify any minimum quantity of chloroform that Atofina was obligated to buy in any one year.  It also did not limit Atofina to selling R-22 made only in Wichita; it could sell R-22 made at other plants.

Atofina President Mickey Lauchert knew when he signed the 1994 Agreement that it would run for an initial term of five years, and would renew automatically for another year until June 1, 2000, unless notice was given to Vulcan before June 1, 1998.  The 1994 Agreement contained a provision identical to Section 2.2 of the 1999 Agreement, except that it contained a five-year Initial Term.  Vulcan moved to terminate the 1994 Agreement at the end of its initial five-year term, by letter dated May 29, 1998.  Vulcan's letter noted that because of the May 29, 1998 notice, "under the provisions of this agreement it will expire on May 31, 1999."  (Pl. Ex. 6 at AT005836.)

Atofina's Dave Thomas stated that the notice provision of the 1999 Agreement constitutes an "evergreen provision" by which the contract automatically renews for 12-month periods, unless terminated with twelve months advance notice.  Thomas understood that, if a notice of termination under the 1999 Agreement was provided too late to prevent automatic renewal, the notice would effectively provide more than 12-months notice of termination.

In August 1999, Thomas told Vulcan, "I'm sure we will have to continue to keep each other advised of events in our respective markets that can have major impacts on our R-22 volumes and pricing."  An Atofina document indicates that that company understood that the price change mechanism (Section 4) of the 1999 Agreement would apply during any notice period following a decision by Atofina to shut down the Wichita plant.

The CDC, or Comité Direction Chimie, is the board of managers for the chemicals branch of the defendants' business.  In May 2001, the defendants produced a summary of the 1999 Agreement, in anticipation of the meeting between the CDC and Atofina's General Manager of Fluorinated Products, Bruno.  The summary stated that the 1999 Agreement had a contract term of "3 yrs Sep '99 to Aug '02, then Evergreen 12 month intervals."  (Pl. Ex. 11, Wichita Project at AT004574.)  The summary also states:  "Termination:  12 months notice, (Aug '01 notice to terminate as of Aug '02)."  (Pl. Ex. 11, Wichita Project at AT004574.)

Defendants' expert witness, Michael J. Clarke, understood that "because the Agreement between Atofina and Vulcan has a contractual 12-month notice of termination provision...," any alleged damages should be addressed "through February 11, 2003, at the latest." (Pl. Ex. 12, Clarke 11/10/03 Report at 12.)  Clarke testified in his signed report that "the agreement also retained an automatic renewal of 12-month periods...." (Pl. Ex. 12, Clarke 11/10/03 Report at 5.)

On March 2, 2000, John Kevgas, Atofina's Vice-President and General Manager of Fluorochemicals, distributed summaries of several Atofina contracts attached to a notice of an upcoming meeting.  One of the summaries related to the Vulcan contract, and said that Atofina signed a chloroform agreement in September 1999 that contained a "12 month evergreen provision with 12 months cancellation notice."  (Pl. Ex. 6 at AT023157.)

10

Atofina believes the 1999 Agreement was in existence and enforceable after closure of the plant in June 2002 until February 11, 2003.

On February 22, 2002, Vulcan's in-house counsel offered Atofina an interpretation of the 1999 Agreement suggesting it terminated on February 11, 2003.

Internal Atofina documents show that an essential element of its policy regarding the Wichita plant was the price of chloroform. In August 1999, an Atofina memorandum emphasizes the importance it has on chloroform price:

> I think we all recognize that the chloroform pricing has a significant impact on the cost structure for our R-22 refrigerant. We also acknowledge and thank Vulcan for the past support for chloroform pricing that allows us to sell R-22 into a very competitive market.

(Pl. Ex. 6 at AT009494-9495.)

Thomas, one of Atofina's executives negotiating the 1999 Agreement, testified:

> As I think back to the events that led to [the 1999 Agreement], I believe it was centered around the pricing element, ... but there were discussions in 1998 and in '99 about a new price mechanism for Chloroform. And I believe those were the primary drivers that led to the creation of this document.

(Pl. Ex. 8, Thomas 30(b)(6) Dep. at 27, 30.)

Bruno Estagnasie testified:

> We saw from the beginning that all of our problems in [R-]22 in North America were stemming from the high price of chloroform that Vulcan had us pay without any possibility of finding another supplier. The more we conducted the study, the more we progressed in the thinking, the more we analysed everything, the remediation costs and the logistical alternative and the possibility of having product at Honeywell, and the high fixed costs that we incurred at Wichita that couldn't be decreased and so on, the more obvious it came to us to say that there was absolutely no solution with Vulcan.

(Pl. Ex. 5, Estagnasie dep. at 129.)

11

In his deposition, Estagnasie identified several problems with the profitability of the Wichita plant, including the nature of the American market, the relative small size of the Wichita plant, and as "[t]he main disadvantage," chloroform and its "high cost." (Id. at 44.)

Estagnasie stated that Atofina had been trying to get a better chloroform price from Vulcan for "years, " and that Atofina had only two options to ensure greater profitability: either get Vulcan to lower its prices or shut down the plant and seek an alternative supply of chloroform (Id. at 79-81, 112-13.)  He testified:  "One scenario was to try to get very quickly a big improvement in the price of chloroform and lower fixed costs because the fixed costs are charged to us by Vulcan in Wichita ... if that was impossible, then we would have to find an alternative."  (Id. at 81).

The evidence shows that the price of chloroform was the single most significant fact driving the defendant's actions.  Other considerations were present.  For example, the Wichita facility was a smaller, single-product facility, thereby resulting in higher fixed costs per unit than Atofina's competitors.  Estagnasie testified that he believed the Wichita plant was a problem because of the price of chloroform, the small size of the plant, and transportation costs from Wichita.  Richard Kanter also noted the small size of the Wichita plant as one factor, in addition to the chloroform cost, in the plant's lack of profitability.  However, a uniform theme throughout the defendants' decisions regarding the Wichita plant was the cost of chloroform associated with the Vulcan contract.  Further, there is no evidence that would support a conclusion that the alternative factors identified by Atofinia were in any way discoveries of facts unknown at the time of the 1999 Sales Agreement.

Atofina's attempts to negotiate price changes were noted by George Bittlingmayer in his report, which noted that (in addition to other proposals such as converting the Wichita plant to another product) "Atofina sought repeatedly to negotiate more favorable terms with Vulcan."  (Pl.

12

Ex. 14, Bittlingmayer Report at 3.)  According to Bittlingmayer, "[t]he resulting squeeze between the cost of the major input [chloroform] and the price of the output [R-22] was a leading cause of low profits and strained the relationship between Atofina and Vulcan." (Id. at 19.)  Bittlingmayer wrote: "Each cent paid per pound of chloroform resulted in extra annual plant costs of $800,000 dollars [sic].  Hence savings of a few cents could spell the difference between million dollar annual profits and million dollar annual losses." (Id. at 18.)  And Bittlingmayer stated that "savings that came from shifting production on purchases of R-22 to sites with lower chloroform costs" contributed to the savings Atofina associated with the Wichita shutdown. (Id. at 22.)

According to Atofina's Mickey Lauchert, Atofina had told Vulcan many times "that if we can't find a reasonable solution to our economics, the costs of raw materials, our fixed costs inevitably, we will have to take that plant down."  (Pl. Ex. 4, Lauchert Dep. at 300.)  He testified that meetings with Vulcan regarding how Atofina could improve its profitability at Wichita "had been going on for a long, long time" and that "[w]e were always unhappy about the price of chloroform." (Id. at 20, 246.)  According to Lauchert, Atofina shut down the Wichita plant because it was losing money. (Id. at 409.)

Officials from Vulcan, Atofina, and Atofina France met in Paris in October 1999.  Atofina identified chloroform pricing problems with Vulcan and stated "we either survive together or we die together!" (Pl. Ex. 6 at AT023156.)   Atofina France's Estagnasie asked Vulcan "for a better chloroform price in Wichita," and he noted that Wichita was Atofina's most expensive plant, making it "a logical choice should we have to rationalize our production."  (Pl. Ex. 6 at AT008602- 8604.) Atofina attempted to get chloroform price concessions from Vulcan in 2000 to improve the

13

economics of the Wichita operation, saying if it could not improve Wichita economics it would cease production at Wichita.

In Fall 2000, Atofina and Atofina France asked Vulcan to lower its chloroform price or enter into a product swapping arrangement.  In September 2000, Atofina offered to discuss a new chloroform contract, asking, "Is Vulcan interested in selling chloroform to ATOFINA Chemicals at Wichita?," and suggesting a global chloroform swap with Atofina France. (Pl. Ex. 6 at AT008545.)

Atofina France's Estagnasie prepared and presented a document titled "RMT Fluorochemicals" at the November 2000 RMT meeting.  "RMT" is a French term that stands for "rendezvous midterm," and is a business review.  The November 2000 RMT presentation noted the impending rapid decrease in U.S. market after 2005.  Estagnasie also wrote that a "return to profitability only depends on obtaining a big decrease of the chloroform price from VULCAN.  The alternative is to shut down and to supply the US packaged market from Europe and China, without any increased cost (extra logistics being compensated by cheaper chloroform cost)."  (Pl. Ex. 37 at AT004060.)  The RMT proposed "initiate a 'hard-ball' negotiation with VULCAN at the soonest," recommending generally negotiating "a lose/lose situation is not a fair win/win deal."  (Pl. Ex. 37 at AT004064.)  The RMT concluded:  "Our preferred choice is to negotiate a deal with VULCAN which would grant ATOFINA a competitive chloroform price at Wichita (less than 21 ct/lb)....  If this is not possible, then we would have to close Wichita."  (Pl. Ex. 37 at AT004064.)

On December 11, 2000, Thomas told Vulcan that Atofina was "making strategic decisions with respect to its sourcing for the North American market," and that Atofina's objective was chloroform at $0.20/lb. beginning January 2001.  (Pl. Ex. 6 at AT009487-88.)  Vulcan responded

by giving Atofina a chloroform price of $0.23/lb.  Previously, Vulcan's chloroform price to Atofina had been $0.26/lb.

An Atofina document from early 2001 recognized that Vulcan was "standing firm at $.23/pound of chloroform." (Pl's Ex. 6 at AT005244-45.)  Another document from the same general time recognizes that "Vulcan has initiated a review to determine potential manufacturing savings (30 days)." (Pl. Ex. 6 at AT005244.)  A third reflects Lauchert's handwritten notes that Vulcan's review of manufacturing savings would conclude at the "End Feb 2001." (Pl. Ex. 6 at AT005244.)  A fourth identifies issues having to do with Vulcan:  "Accept or continue to pressure Vulcan:  Indirect Pressures [or] Tell Vulcan we are shutting down."  (Pl. Ex. 6 at AT005245.)  And a fifth asks, "Are we willing to play poker with Vulcan?" (Pl. Ex. 6 at AT005245.)

In early 2001, the management of Atofina France changed its R-22 business to a global approach.  Estagnasie was appointed global General Manager for the refrigerants business beginning January 2001.  His new responsibilities as global General Manager included management of the North American R-22 business.  After this appointment, Estagnasie saw himself as responsible for improving the results in the company's R-22 business in North America.  As a part of his new responsibilities, Estagnasie undertook a new study of the competitive position of the Wichita plant in 2001.

Until January 1, 2001, Atofina had profit and loss responsibility for North American R-22 production.  Atofina's change in management shifted responsibility for the company's business to the Division of Fluorochemicals and Oxygenated Products ("DFO") in France.  Atofina France's Daniel Laure was the head of the DFO in 2001.

Atofina's criticism of Vulcan's chloroform pricing had been going on since 1994, but became more focused after the management change in 2001.  According to Lauchert, this focus increased because Laure and Estagnasie, the "most vocal critics" of the Wichita production, were now directly responsible for the business.  According to Kanter, "there was pressure within the company to improve the profitability of R-22 at the earliest possible time."  Dave Thomas understood that Estagnasie's personal opinion on the Wichita plant was that it "was the highest cost operation and that it was one that would be shut down."

Atofina's United States employees were not enthusiastic about closing the Wichita plant, and some rigorously opposed it.

On January 5, 2001, Estagnasie told Atofina's Business Manager, Richard Kanter, that despite a recent decrease in Vulcan's chloroform price, Atofina was still far from the additional $0.03/lb. price reduction it wanted to achieve.

Atofina's Tom Parrillo, Mickey Lauchert, and Marshall Turner, and Atofina France's Daniel Laure met in Philadelphia on January 23, 2001.  In minutes of the meeting, it was reported that the "action plan" included a plan to "study the economics of Wichita shutdown" and "in the decision we have to make, we will be driven by the economics, and chloroform price is a key factor."  (Pl. Ex. 19 at AF000227.)  The minutes state that defendants had "accepted and we use the 23 cts/lb price until mid-2001," and that "Vulcan will be back to us end of February with a review of potential manufacturing savings in case they would operate our plant."  (Pl. Ex. 19 at AF000226.)

At some point in late 2000 or early 2001, Atofina began monthly imports of R-22 from Atofina France.

During early 2001, Atofina conducted a study of the worldwide logistical optimization of R-22 supply, including the role of the Wichita plant. Persons both in France and North America contributed to the study.

In March 2001, Estagnasie began negotiating with Honeywell. In April, he indicated to Lee Diestelow, Atofina's Demand Manager, that "[w]e should understand the breakeven point relative to the chloroform price at Wichita." (Pl. Ex. 6 at AT007651; Pl. Ex. 2.)

Diestelow understood that if the Wichita plant could be returned to profitability, it would continue operating. (Pl. Ex. 23, Diestelow dep. at 55-56.) He also knew Estagnasie was engaged in hardball chloroform price negotiations with Vulcan. He understood that Vulcan had not made price concessions significant enough to prevent the Wichita shutdown.

On April 12, 2001, Scott Schwartz at Atofina asked Atofina France to examine the "Current Case" to determine whether Wichita's operating costs could be reduced before considering the "Shutdown Case," but Atofina France officials were less interested in maintaining the Wichita plant than Atofina officials. (Pl. Ex. 6 at AT004151.) Estagnasie testified that by May 2001, he was "working on an alternative" to continuing price negotiations with Vulcan. He testified that part of his June 19, 2001 presentation to the CDC was a recommended chloroform "swap" with Dow: "It's a swap. Dow was shipping chloroform to Europe. Atofina [France] would have shipped chloroform to the United States. Both companies were paying a lot of money in shipping costs. The swap is just the saving of costs for both companies."

In May 2001, Rick Kanter, Atofina's Business Manager for Refrigerants, responded to an e-mail from Atofina's Mickey Lauchert, a regional group President. Kanter set forth an alternative case in the event that negotiations with Vulcan are unsuccessful and therefore we must close the

17

plant.  In order to have a productive negotiation with Vulcan, we need to know what kind of a result we could accept from Vulcan.  Is it 18 cents? 20 cents? No one knows.  That is the purpose of this analysis, to determine what chloroform price (and other terms) we can accept, and where we should walk away and proceed with the shutdown."  (Pl. Ex. 6 at AT007671.)

On May 22, 2001, a letter was drafted to terminate the 1999 Agreement.  The draft termination letter is substantially similar to the letter sent to Vulcan in February 2002.  The letter was prepared before the June 19 CDC meeting, in case the decision to shut down was made and the letter needed to be sent.

As early as May 2001, Atofina was discussing whether or not to notify Vulcan of its intentions.

On June 19, 2001, Atofina France officials made a presentation prepared by Estagnasie, "Timing for Wichita Shutdown," to the CDC.  Jean-Pierre Seewus, President and CEO of Atofina also attended the meeting.  The presentation noted there was excess capacity in R-22 production, arising from ozone legislation which was phasing out emissive demand in the developed countries, along with mandated energy efficiencies in North America.  The report noted that "[d]emand for R22 is expected to decrease in 2003 and progressively switch to HFC 410A," another refrigerant.  The report also noted that the growth in polymer use of R-22 — R-22 is a feedstock for polymer production, a non-emissive use — will "hardly compensate the decline of the demand for emissive uses."  It predicted generally that demand would grow by about 1% per year from 2000 to 2010.

With respect to Atofina's R-22 production, the presentation stated that "Wichita is our less competitive plant (high chloroform price and high fixed costs)."  The most competitive plant was

the Pierre-Benite plant in France.  The presentation noted the production costs per kilogram for R-22

at these plants, as well as two competitors:

| | |
|---|---|
| Dupont (Louisville) | $1.19 |
| Atofina Pierre-Benite | 1.29 |
| Allied-Honeywell | 1.33 |
| Atofina Wichita | 1.51 |

And the presentation stated that the costs of transporting R-22 to North American customers would

be cheaper from Pierre-Benite ($1.93 per kilogram) than from Wichita ($2.28 per kilogram).  The

presentation stated that shutting down the Wichita plant could generate net savings of $3.4 million.

The presentation also noted that Atofina had not placed itself to enter the non-emissive,

polymer market, and that the company "does not have polymer downstream and because most

polymer producers are also producing [R-]22, it has to sell its volumes on the declining emissive

market."  The presentation stated that Atofina "has a case to rationalize its production worldwide,"

and stated:

> We recommend the shutdown of Wichita under the following scenario:
>
> - Give simultaneous notice of both service and chloroform contracts immediately
> - Negotiate a price of chloroform valid until the end of 2002 of 19ct/lb (-88$/T). This will break even with a shutdown of the plant end of 2001.
> - Shutdown the plant at the latest on December 31st 2002
> - This contractual date enables to minimize the penaltyes [sic] to be paid to Vulcan[.]  It gives us 18 months to prepare for the shutdown to fully optimize the alternatives, and to locally produce [R-]22 during the 2002 season.
> - If Vulcan refuse to reduce its chloroform price, give the 150 days notice after having finalized the Honeywell contract.

(Pl. Ex. 20, at AT004023.)

Estagnasie testified that the conclusions in the presentation arose from a combination of

factors, including the price of chloroform, but also "the possibility of purchasing 22 at a relatively

cheaper price in North America, the logistical savings of shipping disposable [containers of R-22] from Europe, [and] the overall logistical optimization." He also testified that the reason for the recommendation for 150 days' notice "was to try, if possible, to match the economics that [defendants] would get in closing Wichita earlier by closing later on by getting a relief in chloroform that could match the economics of closing earlier." (Pl. Ex. 5, Estagnasie dep. at 153-54.) The Action Plan associated with the presentation recommended giving notice to Vulcan terminating the 1999 Agreement by June 30, 2001, and "Evaluate the interest of VULCAN ultimate proposal (if any) on the shutdown date [by July 31, 2001]." (Pl. Ex. 20, at AT004024.)

Laure had to secure approval from the CDC before closing the plant. The CDC did not approve the recommended shutdown of the Wichita facility at the June meeting. Atofina negotiated with Dow and Honeywell the terms under which Atofina might obtain R-22 from those companies.

The negotiations continued through the summer and fall of 2001. On October 19, 2001, Atofina gave Vulcan its forecast of its chloroform requirements for 2002 pursuant to the 1999 Sales Agreement. John Warren, the operations manager at the Wichita plant, prepared the forecast. Warren testified that he did not know what Vulcan may have used the forecasts for, if anything.

The CDC decided in December, 2001 not to give Vulcan notice terminating the 1999 Agreement, until replacement supply contracts with Honeywell and DuPont were signed. The CDC withheld final approval of Estagnasie's shutdown plan, because it wanted to see if Estagnasie could get a better deal with Honeywell. It also directed Estagnasie to continue his study of the economics of the Wichita plant.

The CDC's December 18, 2001 meeting took place at 2:45 p.m. in Paris, France. The presentation on the Wichita closure to the CDC took about 15 minutes. The presentation at the

meeting outlined the highlights of the negotiation results:  the tolling arrangement with Honeywell had been finalized and a draft contract was virtually ready for signature; the purchase agreement with DuPont had been concluded and a draft contract had been sent to DuPont.

The presentation compared the costs of chloroform produced at Wichita (23¢ per pound) against that which could be obtained by the tolling agreement with Honeywell (20.8¢ per pound), yielding a price differential of 2.2¢ per pound.  Overall, the total cost differential for R-22 production was 9¢ per pound (69.6¢ at Wichita; 60.6¢ from Honeywell).  The presentation updated the economics summary associated with closing the Wichita plant, concluding that annual net savings of $6.1 million could be realized by closing the Wichita facility, and outlined areas for potential savings of $1 million associated with closure of the Wichita facility as negotiations continued.  The action plan attached to the presentation proposed that, by December 31, 2001, a chloroform price be finalized with Vulcan for the first half of 2002; that the DuPont and Honeywell contracts be signed by the middle of January, and that production be shut down at the Wichita plant by June 30, 2002.  The CDC accepted the recommendation to shut down the Wichita plant.  Atofina's Demand Manager, Lee Diestelow, testified he learned of the CDC's December 18, 2001 decision the next working day:  "News like that traveled relatively quickly.  I don't remember what day of the week it was, but I would have known about something like that the next working day."  Wednesday, December 19, 2001, was the next working day.

Warren, the Atofina Wichita plant manager, testified that he was told, at some time in December, 2001, that the CDC had agreed to shut down the plant, and that there were some supply contracts that had to be worked out before a final decision would be made.  He cannot recall that there was a any specific time as to when the plant would be shut down.

Atofina France issued a directive which included an "action plan" that spelled out the timing for the Wichita shutdown.  One element of the action plan (with a target date of December 31) was to get a final price from Vulcan for its chloroform for the first half of 2002.  Another was to notify Vulcan of the termination of the Agreement by January 31, 2002.  A third element of the plan was to terminate R- 22 production on June 30.

A December 2001 Wichita Shutdown Update identifies two conclusions from the June 2001 meeting:  (1) "improve tolling conditions with Honeywell" and (2) "secure a cheaper supply of chloroform."  (Pl. Ex. 22, December CDC Update at AT003959.)  The Update states Atofina expected to pay $0.208/lb. for chloroform under its swap agreement with Dow.  The Update showed that shutting down the Wichita plant could result in a total savings of $6.1 million, reflecting a reduction of $9.5 million in fixed costs, offset by additional logistical costs.

The CDC directed Estagnasie, Atofina France's General Manager for Refrigerants, to continue negotiations on the tolling agreement with Honeywell, to achieve greater profitability.

Dave Thomas, Atofina's Manager for Global Chemical Sourcing, met with Vulcan's Bill Ragsdale, in Philadelphia on February 8, 2002, and asked whether Vulcan was willing to change its chloroform pricing formula.  Thomas told Ragsdale that "absent a long-term price formula, that we would — that Atofina would have to make some decisions relative to the 22 business with the information they had, if we didn't have a pricing formula from Vulcan."  (Pl. Ex. 8, Thomas dep. at 68-69.)  On February 11, 2002, Atofina gave Vulcan written notice stating that the 1999 Agreement would terminate on February 11, 2003.  The same day, it notified its customers that it would shut down its Wichita plant at the end of June, but that it had made arrangements to continue to supply R-22 to its customers after that date.

After June 27, 2002, Atofina stopped buying chloroform from Vulcan.  Since June 27, 2002, Atofina has continued to sell R-22 to customers in North America.

There was a demand for R-22 in North America in 2001, 2002 and 2003 that Atofina intended to meet.  In a January 31, 2002 e-mail, Richard Kanter told Danny Wright that Atofina was "staying in the R-22 market."  Atofina had roughly the same number of R-22 customers in the United States after the shutdown.  Its Atofina's customer base did not change significantly between February 2001 and June 2002.

Atofina's Lee Diestelow regularly receives Atofina's R-22 sales records, and believes R-22 sales in March 2003 were "close" to what they were in March 2002.  Since Atofina closed its Wichita R-22 plant in June 2002, Atofina has sold R-22 that is manufactured by Atofina France and R-22 that is manufactured in North America by DuPont and Honeywell.

Estagnasie testified that the decision about closing the Wichita plant "was a question of optimization of our economic situations which was a disaster."  However, he also testified that testimony Atofina could have remained in the R-22 business, even if the Wichita plant had remained in business one or two more years.

Of Atofina's top 20 customers from July 2001 to June 2002, only one was not an Atofina customer in the second half of 2002, and only three were not Atofina customers in the first five months of 2003.

The R-22 production technology used in Atofina's Wichita plant was virtually the same technology used by Honeywell at its R-22 plants.  The R-22 production technology used in Atofina France's European plants did not make the production of R-22 less expensive.

Defendants' replacement supply contracts with Honeywell, DuPont and Dow were essential to assure Atofina a long-term supply of R-22 in North America; the defendants would not have shut down the Wichita plant if they had been unable to secure replacement supply contracts with Honeywell, DuPont, and Dow.  The defendants considered notice to terminate the 1999 Agreement "premature," if it was given before the replacement supply contracts were in place.

Atofina had no specific incentive to start a new supply contract with Honeywell in mid-2002 (rather than at some later time) beyond the pressure inside the company to improve the profitability of its R-22 sales at the earliest possible time.

Since June 2002, Atofina has sold R-22 in North America that is manufactured by Atofina France and manufactured by DuPont and Honeywell.  After June 27, 2002, when Atofina stopped making R-22 at its Wichita plant and stopped buying chloroform from Vulcan, Atofina still required quantities of chloroform and R-22 to meet its obligations to its customers.

The new supply contract with Honeywell is a toll manufacturing agreement, under which Atofina purchases or otherwise acquires raw materials and pays a fee to have those materials manufactured into R-22, with ownership of the raw materials and finished product always remaining with Atofina.  The Honeywell contract called for Atofina to pay a $0.10 tolling fee per pound of R-22 for the first six kilotons of R-22 that Honeywell manufactured for Atofina each year.

After the first six kilotons, Atofina agreed to pay Honeywell a tolling fee of $0.15 per pound of R-22 (up to an additional five kilotons).  The chloroform that Honeywell would use to manufacture Atofina's replacement R-22 would be supplied by Dow at a net price of $457/metric ton, compared to Vulcan's then current price of $507/metric ton.

24

The new supply contract with DuPont allowed Atofina to purchase between 4,000 and 6,000 tons of replacement R-22 per year, at a price of $0.609 per pound ($1,340 per kiloton).  Dow would provide chloroform to DuPont, entitling Atofina France to swap similar quantities of chloroform required for the tolling with Honeywell.

The DuPont supply contract was signed on February 4, 2002.

By the time of the December 18, 2001 CDC meeting, Dow had agreed to supply 100% of the chloroform required to manufacture replacement R-22 for Atofina's North American requirements.

Officials from Atofina France, including Estagnasie, exclusively handled the chloroform swap negotiations with Dow and handled the negotiations with DuPont.

The uncontroverted evidence establishes that the defendants had formed an intention, during the course of 2001, to eliminate further purchases of chloroform from Vulcan and shut down the Wichita plant.  In a February 21, 2001 email, Estagnasie wrote:  "As you all know, we have to complete our study on the Wichita shutdown (not if but when) by the end of may [sic] in order to be prepared to give our recommendation to the top management in june [sic]."

Laure testified:

Q:  And Mr. Estagnasie says to Mr. Kanter and you and others, "As you know, we have to complete our study of the Wichita shutdown, not if, but when."
A:  Yes.
Q:  The decision at that point was that it wasn't a matter of when Wichita would be or — if Wichita would be shutdown but when Wichita would be shutdown.
A:  Absolutely.  And it mentions specifically in gross character, so it is — Yes.

In May 2001, Mickey Lauchert wrote to Rick Kanter that his role with respect to the Wichita project

is not "to lead a campaign to 'save' Wichita!!! And we are well beyond the issue that the intention is to close/not close Wichita!!!" The ultimate decision will be simply

25

driven by the economics.  Your role then is to make sure all the intricacies and complexities of the data gathering, analysis, etc. is driven by you.

Estagnasie testified that he believed Atofina's relationship to Vulcan in May 2001 was: "hopeless.  It was over.  Vulcan couldn't do and didn't want to do anything valuable for us.  It was over." He also believed there was "absolutely no solution" to Atofina's problems that would involve Vulcan.

In October 2001, Rick Kanter stated in an e-mail, which was carbon-copied to Estagnasie, that "we should assume termination of production [at Wichita] on June 30, 2002."

Atofina had concluded negotiations which resolved all major issues of its replacement R-22 supply contract with Honeywell by October 18, 2001.

On December 11, 2001, Estagnasie told Lauchert, "A key point is to terminate production of the R-22 at Wichita at the latest on [J]une 30th 2002."  By the time of the December 18, 2001 CDC meeting, the defendants had finalized the supply contract with Honeywell for replacement R-22.  And Atofina had also completed a draft replacement supply contract for R-22 from DuPont. Agreements in principle were reached between defendants, Dow, and DuPont by December 2001.

The contract between Atofina and DuPont was signed on February 4, 2002 The contract between Atofina and Honeywell was signed the next day.  The first swap transactions between Atofina and Dow did not take place until August, 2002.

Atofina made a conscious decision and engaged in a conscious strategy not to inform Vulcan about the planned closure of its Wichita facility.

Atofina's sales demand and inventory target information was gathered by the S&OP business group under Richard Kanter's direction. The S&OP group was a conglomeration of production personnel from Wichita and business personnel from Philadelphia.

According to Marshall Turner of Atofina, the company knew its chloroform forecasts were "an important obligation that Atofina had with respect to its relations with Vulcan." Atofina understood that the annual forecasts it provided to Vulcan pursuant to the 1999 Agreement were important to allow Vulcan to plan the operation of its facility and to find buyers for its products.

On October 19, 2001, John Warren furnished Vulcan with a written forecast of the amount of chloroform Atofina would need for the remainder of 2001 and for all of 2002. The forecast projected purchases of 30,295 tons of chloroform from Vulcan in 2002, with monthly forecasts ranging between 2,190 and 2,920 tons for the entire year. On December 18, 2001, Warren gave Vulcan an updated written forecast of the amount of chloroform Atofina would need during each month of 2002, which projected purchases of 26,280 tons of chloroform from Vulcan in 2002, with forecasts of 2,190 tons per month for the entire year.

John Warren knew in December 2001 about the CDC's decision to shut down the Wichita plant. He did not act to revise Atofina's chloroform forecasts. He knew when he gave Vulcan chloroform estimates for 2002 that it had been recommended to the CDC that the Wichita plant be shut down during 2002.

Dave Thomas gave Vulcan's Bill Ragsdale an oral forecast for Atofina's 2002 chloroform purchases on or around November 1, 2001. Thomas told Vulcan that Atofina expected to purchase the same amount of chloroform in 2002 as it did in 2001. Thomas later received a phone call from Vulcan's Bill Ragsdale on December 18, 2001. He confirmed his November forecast, and told

Ragsdale that Atofina expected to purchase 2,500 to 3,000 short tons of chloroform per month for all of 2002.  In exchange for Atofina's December 18, 2001 forecast, Vulcan agreed to extend the $0.23 per pound price concession.  As Mr. Thomas recalled the conversation, "Vulcan has decided to extend our current price at $0.23/lb for the first six months provided our chloroform purchase volumes remain in the 2,500 to 3,000 short tons (5-6 million) per month."

Atofina has admitted that Vulcan, when it agreed to the December 2001 price concession, did not know Atofina had all but signed deals with Honeywell and Dow.  Atofina's former Vice President, Tom Parrillo, has testified that the company did not want Vulcan to "know the timing of the closure until [Vulcan] had made a firm price commitment" for 2002 chloroform.

On December 20, 2001, Estagnasie asked Thomas if there was "[a]ny chance to get 22 ct/lb? If you feel a very strong resistance, we shall settle for a guaranteed 23 ct/lb for the next 6 months." He also wrote:  "One essential point is that Vulcan does not increase our price and guarantees it until the end of june [sic] for volumes we can live with."

According to Parrillo:

Vulcan had provided voluntary price relief to try and extend the operation of that plant and could have gone back to a higher price level during that 12 month period on the basis of, hey, look, you know, the party is going to be over in 12 months, so, you know, we might as well get what we consider to be an ordinary price.

Parrillo further testified:

Q:  [Y]ou also said [Atofina] wanted to have price protection before Vulcan found out about the closure of the plant?
A:  Yes.
Q:  Okay, now what did you mean by that?
A:  They wanted a firm commitment, a firm price commitment from Vulcan prior to the plant being closed.
Q:  I see.  So, if I understand what you're saying, Atofina U.S.A.  wanted to make sure that they got a commitment from Vulcan about the price of chloroform that

they were going to have to pay until the plant closed before they told Vulcan the
plant was going to close?

A: That's correct.

Finally, Parrillo stated that the defendants knew they were going to close the plant when they

gave Vulcan chloroform forecasts for 2002:

> Q: It seems — am I wrong, it seems to bother you about this [sic] estimates. Is there
> something about the estimates that bother you?
> A: Yes.
> Q: What is it about the estimates that Atofina gave to Vulcan in October and
> December of 2001 that bother you?
> A: The decision had already been made to close the plant. In principal, the decision
> was made much earlier in 2002. The necessary agreements were perhaps not
> signed, but in principal agreed.
> Q: So, what you're saying is by the time these estimates were given by Atofina
> U.S.A. to Vulcan in October 2001, the plant — it had already been decided that
> the plant was going to be closed and the agreements were basically made?
> A: Yes.
> Q: And you're talking about these agreements with Honeywell, DuPont and Dow?
> A: Honeywell, DuPont and Dow.

(In making this statement, Mr. Parrillo mistakenly referred to 2002, but later corrected himself and

said the decision to close was made by June 2001.)

Had Vulcan known in October 2001 through December 2001 that Atofina was not going to

require chloroform after June 2002, Vulcan would not have extended the $0.23/lb price concession

to Atofina.

Atofina's Mickey Lauchert, admitted that Atofina is run by the French. Atofina's change in

management made Lauchert less involved in the company's business and more of an "asset

manager."

Lauchert was the only representative of Atofina attending the June 19, 2001 presentation to

the CDC presentation, which had the final say on recommendations made by the heads of the global

business units, and which made the decision to shut down the Wichita plant by accepting the recommendations of Estagnasie or Laure. The June 2001 CDC meeting was conducted in French, which Lauchert does not speak. Estagnasie and/or Laure gave Lauchert a "30-word" summary of the June 19, 2001 CDC meeting.

Estagnasie was responsible for recommending the shutdown of the Wichita plant. He directed the work of Atofina's Business Manager, Rick Kanter, relating to the shutdown plan, even though they worked for different companies.

In 2001, Lauchert had to do whatever Estagnasie or Atofina France told him to do. Estagnasie made the June 2001 Wichita closure presentation to the CDC in France. He also made the presentation on the closure of Atofina's Wichita plant to the CDC in December 2001. Lauchert did not attend the December 2001 CDC presentation. When asked why he did not attend the December 2001 CDC presentation, Lauchert responded "maybe they forgot about me."

Atofina asserts it bears no liability because the Wichita shutdown was part of a long-term business reorganization plan. It claims to have exercised reasonable business judgment in closing an inefficient and unprofitable facility.


**B. Conclusions of Law**

**1. Bad Faith**

Vulcan seeks by summary judgment a finding that defendant Atofina breached the 1999 Sales Agreement to purchase the chloroform requirements for its Wichita plant. The parties agree that Kansas law governs Vulcan's breach of contract claim. The Kansas version of UCC § 2-306 is set forth in KSA 84-2-306, which provides:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

The Kansas comments to this section state: "If in good faith a party has no actual output or requirements, it has no duty to perform under the contract." K.S.A. 84-2-306 Kan. cmt. 1. The UCC defines "good faith" generally as "honesty in fact in the conduct or transaction concerned." K.S.A. 84-1-201(19). For merchants, the UCC defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." K.S.A. 84-2-103(1)(b).

The majority of courts addressing the subject have held that the "unreasonably disproportionate" language of 2-306(1) restricts the ability of the buyer to increase purchases, not to decrease them: the buyer can decrease its purchases, subject to the limitation not of reasonableness, but of good faith. *See MDC Corp. v. John H. Harland Co.*, 228 F.Supp.2d 387, 396 (S.D.N.Y. 2002) ("most authorities [hold] a requirements buyer may decrease its orders as long as it does so in good faith").

The leading case on the issue of good faith in the modification of requirements contracts is *Empire Gas Corp. v. American Bakeries*, 840 F.2d 1333 (7th Cir. 1988). The bakery defendant contracted with Empire Gas to buy converters which would allow its fleet of delivery trucks to run on propane. Days after the contract was signed, the bakery decided not to convert its trucks. In *Brewster*, the Seventh Circuit affirmed the decision for the plaintiff on the issue of bad faith, holding that it had met its burden by presenting evidence that the buyer kept its trucks and "the financial wherewithal to go through with the conversion process." 840 F.2d at 1341. The defendant failed to present any evidence of an independent business rationale for terminating its demand.

31

The *Breswster* court observed that the issue can present problems defining the scope of permissible conduct:

> It is a nice question how exigent the buyer's change of circumstances must be to allow him to scale down his requirements from either the estimated level or, in the absence of estimate, the "normal" level. Obviously it need not be so great as to give him a defense under the doctrines of impossibility, impracticability, or frustration, or under a force majeure clause. Yet, although more than whim is required, *see Tennessee Valley Authority v. Imperial Professional Coatings*, 599 F.Supp. 436, 439 (E.D.Tenn.1984), how much more is unclear. There is remarkably little authority on the question. This is a good sign; it suggests that, while we might think it unsatisfactory for the law to be unclear on so fundamental a question, the people affected by the law are able to live with the lack of certainty. The reason may be that parties linked in an ongoing relationship — the usual situation under a requirements contract — have a strong incentive to work out disagreements amicably rather than see the relationship destroyed by litigation.

*Id.* at 1340. But court also cautioned that good faith nonetheless has certain minimum requirements:

> The essential ingredient of good faith in the case of the buyer's reducing his estimated requirements is that he not merely have had second thoughts about the terms of the contract and want to get out of it. *See Wilsonville Concrete Products v. Todd Building Co.*, 281 Or. 345, 352, 574 P.2d 1112, 1115 (1978); *Royal Paper Box Co. v. E.R. Apt Shoe Co.*, 290 Mass. 207, 195 N.E. 96 (1935); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, [130 F.2d 471,] 473-74 [3d Cir. 1942]; White & Summers, [Handbook of the Law Under the Uniform Commercial Code,] 126 [(2d ed. 1980)]. Whether the buyer has any greater obligation is unclear, see id. at 126-27[.]

*Id.* at 1340-41. The standard of good faith "requires at a minimum that the reduction of requirements not have been motivated solely by a reassessment of the balance of advantages and disadvantages under the contract to the buyer." Id. at 1341.

The defendants rely in particular on the decision of the Fourth Circuit in *Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355 (4th Cir. 1994). In that case, Dial had contracted with Brewster to supply the plastic bottle requirements for its Salem, Virginia plant. Ultimately, Dial closed the Salem plant and terminated the contract. In holding that Brewster failed to show Dial

acted in bad faith, the court stressed that the Salem plant was one part of a division of eleven plants across the country, all but one of which was closed because they were all experiencing chronic unprofitability. 33 F.3d at 362. The opinion itself has no discussion of the type set forth in *Empire Gas* as to the particular considerations which may used in good faith to reduce a requirements contract to zero, other than a general citation to *Empire Gas,* summarizing that case with the note that a buyer may eliminate its requirements in the face of a "demand drop." *Id.*

Another court has written that although "there is no established standard" on the issue, the proper analysis is to look to "the buyer's subjective motives to determine if it had a legitimate business reason for eliminating its requirements, as opposed to a desire to avoid its contract." *NCC Sunday Inserts, Inc. v. World Color Press*, 759 F.Supp. 1004, 1009 (S.D.N.Y.1991). "It may be assumed that good faith is required and that a party under contract cannot pretend not to have a requirement to avoid his obligations under the contract." *Fort Wayne Corrugated Paper v. Anchor Hocking Glass*, 130 F.2d 471, 473 (3d Cir. 1942). *See also Diversified Products, Inc. v. Tops Markets*, No. 99-CF-0457E-F, 2001 WL 640697, *5 (W.D.N.Y. June 7, 2001). One recent example of good faith may be found in *Dienes Corp. v. Long Island R. Co.*, (E.D.N.Y. March 19, 2002), where the court granted summary judgment in favor of the defendant buyer on a claim of bad faith reduction of its purchases of replacement parts under a requirements contract. The court noted evidence that the buyer reduced its purchase of the replacement parts "for the simple reason that the part did not need to be replaced as often as was initially expected." Id. at *4. That is, the evidence established that the modification of the requirements was prompted by a recognition of changed circumstances.

The Kansas comments to § 2-306 elaborate on the issue:

> In evaluating whether a reduction is made in good faith, courts distinguish between reductions "merely to curtail losses" (bad faith), ... and reductions because of external events that threaten the viability of the entire undertaking. (good faith).

KSA 84-2-306, Kan. cmt. 1.

The court has little difficulty, in light of the uncontroverted facts, in concluding that Atofina's decision to reduce its requirements for chloroform was not the product of good faith.  The price of the chloroform under the 1999 Sales Agreement played an essential role in Atofina's decision. Alternative justifications used by Atofina to try and rationalize its actions were both relatively unimportant and were manifestly known to Atofina at the time it entered in to the 1999 contract.  Far from being prompted by business considerations which were not previously anticipated or independent of the underlying agreement, Atofina's decision was simply a reflection of its dissatisfaction with the terms of that agreement.  Atofina did not get out of the R-22 business; it continues to sell roughly the same amount of product it did previously — except that it has freed itself of the consequences of its prior contract with Vulcan.

The uncontroverted facts establish that the price of chloroform was the most significant factor affecting Atofina's profit and loss performance; chloroform pricing was always at the center of the Atofina-Vulcan relationship.  Chloroform pricing was the primary issue in the negotiations surrounding the 1999 Sales Agreement.  At the conclusion of those negotiations, Atofina voluntarily entered into the Sales Agreement, which provided for a base chloroform price $0.24 per pound.

However, almost immediately after the agreement was signed, and contemporaneous with a management reorganization among Atofina entities, the defendants began to express concern about the price, and unsuccessfully tried to persuade Vulcan to either lower the price or accept a

product swapping arrangement.  Atofina's General Manager Estagnasie repeatedly stated that Atofina had two options.  Either persuade Vulcan to reduce the price, or shut the plant down.  To the extent other considerations, such as plant size, may have played a role in Atofina's decision, they were clearly peripheral.  According to internal Atofina documents, a "return to profitability only depends on obtaining a big decrease of the chloroform price from Vulcan."

The evidentiary record is devoid of evidence demonstrating a downturn in R-22 demand.  Orders for R-22 had not decreased.  Although Atofina in its brief generally alludes to the gradual phase-out of R-22 under anti-emission legislation, this has been generally known in the industry since 1997, and the phase-out will not completely occur until 2010.  Atofina remains in the R-22 business; it has simply switched suppliers.

Following Estagnasie's recommendations, Atofina used the threat of shutting down the Wichita plant to force Vulcan to lower its price for chloroform, and Vulcan agreed to lower its price to $0.23 per pound.  This was insufficient for Atofina; it commenced work on an Action Plan to study "the economics of Wichita shutdown," specifically noting that "chloroform price is a key factor."

By the middle of 2001, the shutdown of the Wichita plant was "well beyond the issue that the intention is to close/not close Wichita."  The only questions for Atofina involved the details of its plan to remain in the R-22 business while reducing its purchases from Vulcan to zero.  Specifically, Atofina's plan contemplated remaining in the R-22 business by getting chloroform from Vulcan's competitors through a swapping arrangement, and supplying that chloroform to R-22 makers under a toll-manufacturing agreement.

Defendants insist that the CDC did not formally approve the shutdown of the Wichita plant in June of 2001. But this is true only in the most formal sense. The CDC told Estagnasie to continue his negotiations on the substitute supply contracts, and directed that Vulcan not be given notice until those contracts were in place.

Atofina protests that it simply shut down a facility that was losing money. But those losses were not some event *independent* of the 1999 contract; they were inherently *the product* of the chloroform price authorized by the 1999 contract. Atofina saw Vulcan's chloroform price as the "main disadvantage" in its American R-22 production. Atofina's management "saw from the beginning that all of our problems in [R-]22 in North America were stemming from the high price of chloroform that Vulcan had us pay."

Atofina may have reorganized its R-22 business. But it remains in the business, supplying R- 22 to its customers through a series of swapping arrangements and toll-manufacturing. "A buyer may go out of business altogether and hope to escape a burdensome requirements contract in this way. But if he only reorganizes the form of his business, a court will surely see through this and hold him liable on the contract." James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 3-9, at 155 (1995). What matters is not the form of the organization, but its underlying purpose, its intent.

And a rational fact-finder reviewing the history of Atofina's actions could only conclude those actions were motivated by a desire to avoid the consequences of the Vulcan contract. Atofina was dissatisfied with the price contained in the requirements contract, so it acted to circumvent the contract.

36

Defendants suggest that their actions were legitimate under the law so long as avoiding the contract was not the "predominant" factor in their decision. First, the court finds the argument unpersuasive as a statement of law; no case law supports such an approach. To the contrary, the cases consistently suggest that bad faith exists if contract avoidance played a significant causal role in the buyer's decision to reduce her requirements to zero.

Second, that suggestion is in any event not supported by the uncontroverted facts, which establish that the key factor in Atofina's decision regarding the Wichita plant was the price of chloroform under the Vulcan contract. The other factors suggested by Atofina — the relative small size of the Wichita plant, the fact that it was a single-product facility, the general phase-out of emissive R-22 — are facts which were well known to Atofina at the time it entered into the 1999 contract; in other words, those factors were not independent of the contractual relationship created by the 1999 agreement. Those factors were also minor. For Atofina, "the main disadvantage was chloroform," or rather, as it was priced under the 1999 contract. The defendant acted in bad faith because the inescapable core of Atofina's decision was a desire to avoid the chloroform price terms it had agreed to in 1999. *Empire Gas*, 840 F.2d at 1340-41.

## 2. Fraud and other claims

Plaintiff Vulcan seeks a determination that the defendants' conduct amounted to fraud. Defendants seek a determination that Vulcan can recover, if at all, only for its claims of breach of contract, not for either fraud or unjust enrichment.

The court will grant summary judgment in favor of defendant Atofina as to the claims of fraud and unjust enrichment. The court will also grant summary judgment to defendants as to the

claim of conspiracy to defraud.  The court will reserve ruling on the claim of fraud against defendant Atofina France.

Notwithstanding the protestations contained in its briefs to the court, it is apparent that the substance of Vulcan's claims of fraud and unjust enrichment closely track those of its breach of contract claims, and the fraud claims seek recovery for sums which would fall within the damages sought under the contract claims.  Vulcan alleges that defendants violated the contract by terminating its purchases earlier than permitted under the contract, by giving false and misleading estimates of its anticipated requirements for 2002, and by breaking a December 2001 agreement to buy chloroform for 2002 in exchange for a discounted price.  It also alleges defendant Atofina defrauded it by not telling Vulcan that its October and December 2001 estimates were misleading , and that it represented it would buy chloroform throughout 2002.  As to Atofina and Atofina France, Vulcan alleges a conspiracy to defraud by making false forecasts and hiding Atofina's imports. And against Atofina France, Vulcan alleges fraud in inducing Atofina to misrepresent its requirements and stop buying chloroform in mid-2002.

Here, the duties underlying the breach of contract claims substantially replicate those under the tort claims.  In both cases, Vulcan contends that defendants violated an obligation to operate in good faith in meeting its duties under the contract.  The close tie between the two claims may be seen in Vulcan's argument in support of its motion for summary judgment on the breach of contract claims, where it notes that "Atofina's bad faith shutdown of the Wichita plant is also proved by the fraud perpetuated against Vulcan during the shutdown planning." (Pl. Br. at 50).  In every real sense, the fraud and contract claims here are two sides of the same coin.

38

The leading case on the issue in the Tenth Circuit is *Isler v. Texas Oil & Gas Corp.*, 749 F.2d

22, 23-24 (10th Cir. 1984), where the court observed:

> The very notion of contract is the consensual formation of relationships with
> bargained-for duties. An essential corollary of the concept of bargained-for duties
> is bargained-for liabilities for failure to perform them. Important to the vitality of
> contract is the capacity voluntarily to define the consequences of the breach of a duty
> before assuming the duty.
>
> This case is illustrative. The effect of confusing the concept of contractual
> duties, which are voluntarily bargained for, with the concept of tort duties, which are
> largely imposed by law, would be to nullify a substantial part of what the parties
> expressly bargained for--limited liability. Unless such bargains are against public
> policy (covered either by prohibitory statutes or well-defined, judge-made rules such
> as unconscionability), there is no reason in fact or in law to undermine them. Indeed,
> it would be an unwarranted judicial intrusion into the marketplace. No reason
> appears to support such a radical shift from bargained-for duties and liabilities to the
> imposition of duties and liabilities that were expressly negated by the parties
> themselves when they decided to abandon their status as legal strangers and define
> their relationship by contract. Tort law proceeds from a long historical evolution of
> externally imposed duties and liabilities. Contract law proceeds from an even longer
> historical evolution of bargained-for duties and liabilities. The careless and
> unnecessary blanket confusion of tort and contract would undermine the carefully
> evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy
> and imposed them on individual members of society without their consent. The
> social policy in the field of contract has been left to the parties themselves to
> determine, with judicial and legislative intervention tolerated only in the most
> extreme cases. Where there has been intervention, it has been by the application of
> well established contract doctrines, most of which focus on threats to the integrity of
> the bargaining process itself such as fraud or extreme imbalance in bargaining power.
>
> Further, it should not matter whether the breach of a bargained-for duty arises
> from inattention, a disagreement over the existence of the duty, a dispute over the
> nature of the duty, an inability to perform the duty, or a simple unwillingness to
> perform the duty. The parties by contract (or in the absence of an express provision,
> by implied rules evolved under contract analysis) have themselves defined the
> consequences of the breach. In the marketplace of contract, a breach is a breach is
> a breach — unless the parties choose to specify otherwise.

The Kansas Supreme Court relied on *Isler* in its decision striking a jury verdict awarding tort

damages to a counterclaiming defendant in *Ford Motor Credit Co. v. Suburban Ford*, 237 Kan. 195,

39

699 P.2d 992, *cert. denied,* 474 U.S. 995 (1985).   The Kansas court noted that Isler was "a wellreasoned opinion pointing out the impropriety of confusing contract and tort law." 237 Kan. at 203.

This court has applied the same principle.   In *Hammer Realty Group v. Continental Western Ins.*, 2000 WL 1744932 (D.Kan. 1996), the court concluded that plaintiffs could not advance a tort claim where the facts of the case showed a duty arising in contract.   The court observed:

> Regardless of when defendant decided to deny plaintiff's claim, that decision directly relates to the alleged breach of the parties' contract.   The allegedly fraudulent representations are the promises made in the contract itself.   The parties entered a bargained-for agreement that created contractual duties.   Plaintiff agreed to pay insurance premiums at a specified rate and defendant agreed to insure the plaintiff against "specified causes of loss."  The bargained-for nature of these duties displaces the imposition of similar tort duties such as those advanced by plaintiff's second count.

2000 WL 1744932 at *2.

The court reached a similar conclusion in *Kanco Distributing v. Snapper, Inc.*, No. 96-1397-JTM, 1998 WL 47594 (D. Kan. Jan. 26, 1998), where it dismissed a claim of conversion where the same facts underlay a breach of contract claim.   The court wrote:  "Where, as here, the rights of the parties are otherwise defined by contract, the court believes those documents should control the duty of the parties rather than importing general tort duties."  *Id.* at *8.

And in *Parsons v. Davis*, No. 95-1458-JTM, 1997 WL 446264 at *4 (D. Kan. 1997), the court concluded:

> The general rule in Kansas and elsewhere is that the existence of a contract relationship bars the assertion of tort claims covering the same subject matter governed by the contract.   *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F.Supp. 1445, 1461 (D.Kan.1995).   Additional tort duties may not be imposed where the parties' duties and rights are specifically defined by contract.   *Id.*  In addition, damages which are recoverable as economic damages for breach of contract may not

be recovered under both a contract and a tort theory. *Equitable,*[*Life Leasing Corp. v. Abbick*], 243 Kan. [513,] 516, 757 P.2d 304 [(1988)].

*See also Joseph v. Terminix Intern. Co.*, No. 91-1045-K, 1992 WL 24686 (D. Kan. 1992) (noting that duties under contract "are voluntarily bargained for rights and obligations" while tort duties are "imposed by law [and i]n order to uphold the principles of freedom of contract, no tort duty can be imposed on a party where that party's rights and duties are specifically defined by contract").

Vulcan suggests that the above authorities do not apply where there has been an intentional fraud, or, in the language of Vulcan's brief, the tort claim asserts a claim of malfeasance rather than merely failure to perform. But this argument finds no purchase in Kansas law. It is notable that in *Suburban Ford*, the Kansas Supreme Court noted that defendant had presented a "baker's dozen" tort claims — specifically including fraud — and the court nonetheless concluded no tort claims should have been presented to the jury.

> Nothing would be added to this already lengthy opinion by individually discussing each tort theory and specifically finding each improper. It is sufficient to state we have reviewed each such theory and find that the trial court erred in submitting ***any*** tort theory to the jury.

237 Kan. at 205, 699 P.2d at 1000 (emphasis in *Suburban Ford*). What mattered to the court was not how the tort was denominated, but commercial and contractual nature of the underlying relationship, stating that "[i]t should be emphasized that all parties to this action were in a ***contractual*** relationship with each other, and their difficulties with each other arise directly from that contractual relationship. 237 Kan. at 203, 699 P.2d at 998 (emphasis, again, by *Suburban Ford*).

The court will reserve ruling on the claims of fraud against defendant Atofina France, and neither grant nor deny the motions by both plaintiff and defendant on the issue. The undisputed facts do not allow the court to conclude that Atofina France either did, or did not, commit fraud by

41

inducing Atofina to engage in specific actions with respect to the Wichita plant.  Simply put, the evidence is not of a sufficient state to form a definite conclusion as to the nature of Atofina France's corporate relationship to defendant Atofina, the extent to which it may have controlled or directed Atofina's actions, and hence the role it may have played in the alleged fraud.  Because these issues require fuller treatment at trial, the court denies summary judgment as to the issue.

The court will grant summary judgment as to the claim of civil conspiracy among the defendants.  Generally claims of conspiracy will not lie as to affiliated corporations.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (applying doctrine limiting conspiracy claims under antitrust law).  Because "a conspiracy requires at least two parties," conspiracy actions against must receive careful scrutiny, since "[a] corporation is not capable of conspiring with itself." *Lantec, Inc., v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002) (citing *Copperweld*).  The doctrine identified in *Copperweld* has been applied to general claims of civil conspiracy.  *Pizza Mgmt. v. Pizza Hut, Inc.* 7347 F.Supp. 1154, (D.Kan. 1990).

Vulcan objects that the precise nature of the corporate ownership of the defendants is unclear, and the court has noted the uncertain nature of Estagnasie's testimony on the point.  But that uncertainty appears to whether Atofina and Atofina France are separate sister corporations, or whether they are sister companies without a separate a separate corporate existence.  His testimony is sufficient, however, to establish that Atofina and Atofina France are not unrelated corporations, but closely related companies *under the same general ownership* of TotalFinaElf.  Because the evidence demonstrates at a minimum that both defendants acted with "one consciousness guiding the economic decisions," the claim of civil conspiracy is ill-founded, and will be dismissed.  *Pizza Mgmt.*, 737 F.Supp. at 1166.

42

The court grants summary judgment as to Vulcan's claim of unjust enrichment as to defendant Atofina. Vulcan indicates in its response brief that this claim is directed at Atofina France rather than Atofina. Summary judgment is therefore appropriate as to defendant Atofina. As to Atofina France, the defendants argue that a quasi-contract claim should be dismissed in light of the existing contractual relationship protecting the plaintiff. *See Member Servs. Life Ins. Co. v. American Nat'l Bank & Trust*, 130 F.3d 950 (10th Cir. 1997). Although the contract here was with Atofina, rather than Atofina France, the defendants cite *W&W Oil v. Capps*, 784 S.W.2d 536, 537 (Ct.App.Tex. 1999) for the proposition that an unjust enrichment claim is precluded against third parties to the contract.

This reads *W&W Oil* too broadly, since that case dealt an unjust enrichment claim "seeking recovery from a third party *foreign* to the original contract." *Id.* at 537 (emphasis added). That this is simply the general (but not unqualified) rule may also be seen in *National City Bank v. Fleming*, 2 Ohio App.3d 50, 440 N.E.2d 590, 599 (1981), where the court reached a similar conclusion, rejecting a quantum meruit claim by plaintiff for repairing the vehicle of a third party beneficiary, where the defendant "first learned of the repairs ... after [they] were complete." But the court there distinguished cases such as *Costanzo v. Stewart*, 9 Ariz.App. 430, 453 P.2d 526 (1969), which have concluded that a contract beneficiary may be liable in equity if he induces the conferral of the benefit. And the Fourth Circuit has explicitly rejected the suggestion that various cases, including *W&W Oil*, stand for the principle that the existence of a contract remedy against one defendant necessarily bars equitable claims against all other parties; instead, the doctrine only protects third parties who were "foreign" to the contract in that they did not aid in inducing the plaintiff's actions. *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital*, 961 F.2d 489, 492 (4th Cir. 489) (citing

43

W&W Oil).  *See also Peter v. United States*, 6 Cl.Ct. 768, 780 (1984) (rule barring action on implied

contract where express contract exists "has full effect only when the parties to both contracts are the

same").


**3. Vulcan's damages and the Evergreen Agreement**

Vulcan also seeks summary judgment on the extent of its contract damages.  Vulcan contends

that, since Atofina failed to terminate the 1999 Sales Agreement by the contract's annual renewal

date, the contract term automatically renewed, and its contract damages run from July 2002 to

August 31, 2003.  Atofina contends that Vulcan's damages would run only for 12 months after the

date of notice, until February 11, 2003.

Section 2.2 of the 1999 Agreement, which became effective on September 1, 1999, provides:

> The initial term of this Agreement shall extend for three (3) years after it becomes
> effective ("Initial Term").  Thereafter, this Agreement shall renew automatically for
> successive twelve (12) calendar month periods ("Additional Term(s)") unless the
> Agreement is terminated pursuant to the provisions of this Agreement.  In addition
> to the specific rights of termination provided herein, either party may terminate this
> Agreement after the Initial Term effective upon the expiration of twelve (12) months
> prior written notice mailed to the other party.  The Initial Term and any Additional
> Terms shall sometimes be collectively referred to herein as the "Term."

Under the ordinary operation of the contract, the primary, "Initial Term," was for three years.

Thereafter, absent termination, the contract would perpetually renew for additional, one year terms.

The issue before the court is when is the effective date of a termination, when notice is given in the

middle of a term.  Vulcan contends that under the contract, the final effective date must be at the end

of a term, on an annual anniversary of the effective date of the contract (September 1, 1999).  It is

uncontroverted that Atofina's February 11, 2002 notice was subsequent to the end of the Initial Term

of the contract, and that by operation of the contract's § 2.2, the contract had by then already been extended for another term, until August 31, 2002.

Vulcan correctly notes that Atofina understood that the 1999 agreement was an evergreen contract.  "'Evergreen clauses' provide that the term of the contract will be extended for some specified period beginning with the date of expiration of the primary term.  The contract would remain in effect until terminated by action of one of the parties after giving the required notice prior to the anniversary date." *Superior Oil Co. v. Pioneer Corp.*, 532 F. Supp. 731, 733 (N.D. Tex. 1982) (*quoting F.E.R.C. Order* No. 68, 45 Fed. Reg. 5678, 5683 n.15 (Jan. 18, 1980) (codified throughout 18 C.F.R. pts. 270 & 271)).  Vulcan notes generally definitions such as that contained in BLACK's LAW DICTIONARY 321 (7th ed. 1999), which provide that an "evergreen contract" is one "that renews itself from one term to the next in the absence of contrary notice by one of the parties."

However, while evergreen contracts typically extend for an additional set term if not otherwise terminated, it does not fall that all such contracts terminate in such fashion.  The court has found no authority for such a proposition, and Vulcan has cited to none.  Instead, all of the authorities cited by Vulcan turn, as they must, on the specific contract language employed in each case.

For its argument, Vulcan relies in particular on *Zurn Constructors v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1174-75 (D. Kan. 1988).  In *Zurn* the court reviewed an evergreen contract, part of which provided:

> This contract will be in effect for a primary period of one (1) year beginning March 1, 1982 to February 28, 1983 and, in effect, thereafter on a year-to-year basis, subject to termination by either party giving the other sixty (60) days written notification. Seller and Buyer agree to meet at least sixty (60) days prior to anniversary ending date for the purpose of negotiating terms for subsequent years.

685 F.Supp. at 1175 n.1.  The court concluded as a finding of fact:

> This "evergreen" clause provides a one-year primary contract from March 1, 1982, to February 28, 1983.  This contract is automatically renewed for another year, unless either party gives written notice of termination at least sixty days prior to the February 28th expiration date.

Id. at 1174-75.

Similarly, in *Winthrop Res. Corp. v. Advanced Telecomm*, No. 01-640, 2002 WL 31777799, at *2 (D. Minn. Dec. 10, 2002), also relied on by Vulcan, the lease in question contained language specifically defining when notice of termination must be given in relation to the end of a term:  the lease provided that it "may be terminated without cause at the end of the Initial Term or any year thereafter by either party mailing written notice of its termination to the other party not less than one hundred twenty (120) days prior to such termination date."

Both cases follow the same approach:  the contract renews for another term (almost always a year), unless notice of termination is given some period (60 or 120 days) before the end of a term.

See also *International Ass'n of Bridge, Structural, and Ornamental Iron Workers v. J&N Steel & Erection*, No. 99-4075, 2001 WL 392048 (6th Cir. April 13, 2001) (evergreen contract provided it "shall automatically renew unless written notice is given by either party not less than one hundred twenty (120) days prior to the expiration date or any renewal thereof"); *Centrals States, Southeast & Southwest Areas Pension Fund v. Kabbes Trucking*, No. 02-C-1809, 2004 WL 2644515 (N.D. Ill. Nov. 18, 2004) (evergreen provision provided that the contract "shall continue in full force and effect from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to annual date of expiration.") In all of these cases except *Zurn*, the time for termination is directly and explicitly tied

46

to the end of the term, and in *Zurn* the relationship is nevertheless present — the terminating party must given 60 days notice, and the immediately following sentence provides that the parties must meet 60 days before the new renewal date to agree on terms.

Here, the language of Section 2.2 of the Agreement is different in important respects from that contained in the cited cases. First, it may be noted that the unlike the cited cases, which have a relatively short time for notice compared to the length of the additional, extended term (60 or 120 days versus one year), the contract here speaks of an amount of notice no shorter than the additional term itself (twelve months). As a result, it is unsurprising that the cited cases would not agree to deeming the contracts dead a month or two after notice was given — to do so would result in a drastically shortened term, theoretically a twelve-fold decrease. In the present case, by contrast, Atofina's interpretation of the contract does not do violence to the general goal of protecting the parties' ability to plan for the next twelve months, while Vulcan's position has the effect of almost doubling (two years less one day) the effective time a party who wants out of the contract would have to wait if they miss they giving notice by the anniversary date.

Much more importantly, Vulcan's position requires the court to ignore the explicit language of the contract, which may be emphasized thus:

> The initial term of this Agreement shall extend for three (3) years after it becomes effective ("Initial Term"). Thereafter, this Agreement shall renew automatically for successive twelve (12) calendar month periods ("Additional Term(s)") unless the Agreement is terminated pursuant to the provisions of this Agreement. **In addition to the specific rights of termination provided herein**, either party may **terminate** this Agreement after the Initial Term **effective upon the expiration of twelve (12) months** prior written notice mailed to the other party. The Initial Term and any Additional Terms shall sometimes be collectively referred to herein as the "Term."

The Agreement thus does far more than the contract language contained in the cited cases. That is, it does not merely state when the notice should be given; it also states that, in addition to everything else, a party may terminate the agreement "effective" twelve months after the notice.  The court concludes that the plain language of the contract provides that Vulcan's rights under the contract ended on February 11, 2003, twelve months after Atofina's notice of termination, which was when the notice took "effect[]."

Vulcan argues that the contract cannot end on February 11, 2003, since this would create a period term not defined in the Agreement; no terms of less than 12 months are permitted.  But this argument is unpersuasive in light of the plain language of the contract.  Vulcan also cites to the testimony of Atofina personnel as to their general understanding of evergreen contracts.  First, these witnesses give only general opinions as to the effect of such contracts — they renew annually — and do not address the question specifically before this court:  what is the effective date of the end of the contract if there is a notice of termination? Second, the interpretation of those witnesses cannot vary the plain wording of the contract itself.

Nor is Vulcan more substantial ground when it rhetorically asks, "If the parties intended the contract to be terminable at will after the Initial Term, then why include the annual automatic renewal feature?" (Pl. Br. at 72).  The longer answer is that, first, the contract is not terminable "at will," as that term is generally understood in the law, meaning a relationship which can be ended immediately without notice or other continuing duties.  The agreement provides for termination rights but they are carefully and explicitly limited under the contract:  a party can give notice of termination, but must still perform its contract duties for the next twelve months.  Second, annual renewal and termination are not incompatible, and the parties may well have intended precisely the

48

result contemplated here — generally the contract automatically renews for a definite term in the absence of notice to terminate.  The short answer would be that, if this result is indeed contrary to Vulcan's original but private intentions, the Agreement from its point of view is simply not well drafted.  The function of the court is to enforce a contract as it is actually written by the parties, not to create one based upon what the contracting parties wisely should have done.  *NEA-Coffeyville v. Unified School Dist. No. 445*, 268 Kan. 384, 404, 996 P.2d 821 (2000).  Absent ambiguity in the language of a contract, "a court must give effect to the intent of the parties as expressed within the four corners of the instrument."  *Blair Constr. v. McBeth*, 273 Kan. 679, 691, 44 P.3d 1244, 1252-53 (2002).

The court grants defendant's partial summary judgment motion seeking a determination that Vulcan's damages under the Sales Agreement are limited to the twelve month period after the February 11, 2002 notice of termination.


## II. Motions in Limine


Vulcan has moved to exclude the testimony of both the expert testimony of Richard Kanter and Walter Schumacher.  Both are agents of Atofina — Kanter is a managerial employee, Schumacher is corporate counsel — who would testify as to the 1999 Sales Agreement.  Kanter would testify generally as to UCC law as to requirements contracts and both Kanter and Schumacher would testify as to the meaning of the Agreement's termination provisions.  Vulcan objects to the proposed testimony on the grounds that Kanter and Schumacher both offer merely inadmissible legal conclusions.  Vulcan also argues that Kanter does not qualify as an expert.

49

Although the court finds merit in Vulcan's arguments, and would grant the motions in the absence of the summary judgment rulings included herein, the court finds that plaintiff's motions should be denied as moot. As noted elsewhere in this order, the court finds that the terms of the Sales Agreement are not ambiguous, and govern the relations of the parties in the manner noted in this opinion. The remaining questions before the court relate to damages and the alleged fraud by Atofina France. Since there is no indication that Kanter or Schumacher have given objectionable expert testimony as to these issues, the court need not resolve the motions advanced by plaintiff.

Next, Vulcan has moved to exclude the expert testimony of James Connelly, a transportation manager who has testified as to Vulcan's expected damages. Specifically, on the issue of mediation of damages, Connelly has testified that Vulcan sold its chloroform elsewhere by using chlorine railroad cars given up by Atofina in 2002 when it cut back on its own transportation. Vulcan's position is that the railroad car market was so tight that, after the adjacent Atofina plant was closed, it could not sell any of its chloroform to other customers. Connelly testified that Vulcan would have needed only 35 to 40 railroad cars to sell 2000 tons of chloroform each month.

Vulcan seeks to exclude Connelly's testimony because Connelly failed to test or confirm his general opinions that (1) the railroad cars given up by Atofina were available to be leased by Vulcan, and (2) that those chlorine cars could be modified to carry chloroform. Brice Elliot, Vulcan's expert, has testified that modifying the railroad cars would require extensive modifications, which he as "a guess" would estimate to be between $15,000 to $20,000 per car. (Dkt. No. 378, Exh. D. at 141-42).

The court will deny Vulcan's motion. Vulcan singles out one element of the scientific method (testing of hypotheses) to support exclusion. But Connelly testified that he had personal knowledge, from his role as chemicals transportation manager for Atofina, as to the nature of the

50

railroad car market in 2002.  At that time, due to the closure of several chemical plants around the country, there was a significant surplus of railroad cars.  Connelly has firsthand experience in the refitting of railroad cars (in this instance, altering a chlorine car to fluorochemical).  He testified that the modification took at most 90 days, and could be performed to render the cars capable of carrying chloroform for $2000 (or $7000 if the car's pressure plate needed to be changed).  The court finds that independent testing is not a sine que non of expert testimony admissibility where the expert can corroborate his opinions based upon his own prior personal knowledge of the facts underlying his opinion.

Next, Vulcan seeks to exclude testimony of any "advice of counsel" evidence on behalf of Atofina.  Specifically, Vulcan seeks to exclude evidence Atofina might offer which would suggest that its decisions were rendered by the advice of counsel.  It argues that Atofina failed to present the subject as a separate affirmative defense, that it has waived the issue, and that its witness Schumacher cannot give admissible testimony as to the issue.  The court finds Atofina has not waived the issue, which is not an independent affirmative defense, but evidence which could bear upon an element of Vulcan's claims:  whether Atofina had the intent to deceive required for fraud.

Vulcan correctly notes that defendants have presented no authority in Kansas law for the proposition that advice of counsel is a defense to a claim of fraud.  But the defense is recognized as a defense to a claim of malicious prosecution. *Bartal v. Brower*, 268 Kan. 195, 993 P.2d 629 (1999).

As to fraud, the one Kansas case touching on the subject appears to be closely tied to the fiduciary nature of the relationship involved.  In *McAdam v. Fireman's Fund Ins.*, 203 Kan. 123, 452 P.2d 851 (1969) the court upheld a claim for fraud by a minor against his guardian, holding that the guardian was not entitled to use advice of counsel as a defense.  The court stressed that the guardian

51

is not an insurer, and is only liable when he fails to "exercise the diligence and prudence ordinarily employed," that is, acts without due care, 203 Kan. at 127, 452 P.2d at 855, and that in the case before it, the evidence established that the defendant's conduct was more "than mere carelessness or imprudence." 203 Kan. at 128, 452 P.2d at 856. Ultimately, the court concluded that "[t]he mere fact that a fiduciary relies upon the advice of counsel cannot be regarded as an adequate excuse where his conduct" violates her standard of due care. 203 Kan. at 128, 452 P.2d at 855.

There is, however, substantial authority from other states for the conclusion that evidence of advice of counsel, while not a complete defense to claims of fraud, is at least admissible as relevant to the question of a defendant's alleged fraudulent intent. Thus, in *Rea v. Wichita Mortgage Corp.*, 747 F.2d 567, 576 (10th Cir.1984), citing a long list of federal appellate decisions from around the country involving cases such as tax evasion, mail fraud, and unfair labor practices, observed that

> reliance on the advice of legal counsel is recognized as a valid defense in both civil and criminal contexts. While such reliance is not an absolute defense, it is a factor to be considered in determining a defendant's good faith, willfulness, or illegal intent.

Decisions applying state law are consistent. *See Garvin v. Secretary of State*, 266 Ga.App. 66, 73(2), 596 S.E.2d 166 (2004) ("a claim by the violator that he or she acted in reliance on the advice of counsel is a factor which may be considered along with all other circumstances relevant to the issue of whether the conduct was a knowing and intentional violation" of Georgia Security Act); *Brashears v. Collison*, 207 Md. 339, 115 A.2d 289, 294 (1996) ("[o]f course, the law does not excuse a person in all cases merely because he relied on the opinion of his attorney; but he is not liable in this form of action, which has for its basis actual fraud, when he has acted on the opinion of his attorneys in making a statement, if he did so honestly").

The court finds that evidence of advice of counsel may be introduced at trial to demonstrate whether or not defendant Atofina France acted with fraudulent intent.

The court will grant the motion to exclude the environmental testimony of Tracy Winter.

Winter would testify, according to Vulcan, that the true costs of environmental remediation at Atofina's Wichita plant were on the order of $15 million, rather than the $2 to 4 million that are reflected in Atofina's internal estimates, and that this helps to show that those plans "intentionally understated the true cost" of remediation in order to justify the shutdown of the plant.  (Dkt. No. at 8).

Winter's testimony is inadmissible for two reasons.  First, although Winter is a long-term, 30- year Vulcan employee, it is apparent that the vast majority of this experience had nothing to do with environmental issues.  Only in the last four years has Winter been placed in charge of Vulcan's remediation projects.  Vulcan notes that in this role Winter has managerial supervision of five environmental engineers and one environmental superintendent, but there is no evidence that this general supervisory role includes actual experience with creating cost estimates for cleanup efforts. To the contrary, Winter acknowledged in his deposition that he has never in his job previously given an off-site cost estimate of environmental remediation, and even as to Vulcan's own plant, he has merely "given it a great deal of thought," without committing any of those thoughts to paper.  (Dkt. No. , Exh. A, at 13-14).  Winter's only formal training is a single, week-long seminar he attended.

Winter's estimate of the ultimate cost of remediating the Atofina facility, based on extremely limited personal history and training in subject, and which were rendered without accounting for specific cost estimates (the amount of soil to be tested at the Atofina plant, the cost per test, etc.) forces the court to conclude that Winter's testimony is insufficiently reliable to be presented at trial.

Second, Winter's testimony is irrelevant because it sheds no light as to Atofina's motivation for closing the Wichita plant.  Environmental remediation costs for that plant were both fixed and sunk; they would be incurred whether the plant was shut down in 2002 or at some future date.  The anticipated environmental costs were presented to the CDC in 2001, but they were not included in the estimated yearly savings from shutting the plant down.  They could not play a role in motivating the CDC to shut the plant down because they could not be avoided by shutting the plant down at any particular time.

### III. Motion to Strike

Plaintiff Vulcan has moved to strike the statement of Hélène Monceaux, on the grounds that the declaration was issued outside the United States and not in the form required by 28 U.S.C. § 1746.  Defendants have responded by filing a modified declaration; Vulcan argues that the amended declaration is untimely (preventing Vulcan from obtaining discovery about them) and irrelevant (in that the evidence does not establish the nature of the defendants' corporate structure prior to December 2000).

The court will deny Vulcan's motion.  The evidence is plainly relevant to the issue of the corporate structure of defendants at the critical time when the decisions were made with respect to closing the Wichita plant.  Further, given the nature of its allegations against Atofina and Atofina 45 France, it is simply not credible for Vulcan to now argue that, only with the production of this declaration and the associated chart, has it been presented with the need to conduct discovery on the general issue of the defendants' corporate ownership.  Response by affidavit is a standard feature of

54

summary judgment practice, and the court finds nothing unfair in the evidence presented by the defendants.

**IV. Motion for Surreply**

Finally, the court has at hand plaintiff Vulcan's request for leave to file a surreply. (Dkt. No. 401). Surreplies are disfavored, the present case presents no reason for departing from the general rule, and the parties have already received more than sufficient opportunity to brief all issues relating to the case. Vulcan's motion is denied.

IT IS ACCORDINGLY ORDERED this 11th day of February, 2005, that the court grants in part and denies in part, as provided herein, the Partial Summary Judgment Motions of Vulcan (Dkt. No. 367) and Atofina (Dkt. No. 368, 369); the court denies the Motions in Limine of Vulcan (Dkt. No. 343, 361, 363, 365) and Atofina (Dkt. No. 370), and Vulcan's Motions to Strike (Dkt. No. 398) and File Surreply (Dkt. No. 401). The Clerk of the Court shall file this Order free from any seal.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE